THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State, Respondent,
v.
Brian William Scott, Appellant.
 
 
 

Appeal From Greenville County
 Edward W. Miller, Circuit Court Judge

Unpublished Opinion No. 2006-UP-336
Heard May 31, 2006  Filed September 21, 2006

AFFIRMED

 
 
 
Mr. Brian W. Scott, of Pelzer,  for Appellant.
Attorney General Henry Dargan McMaster Chief Deputy Attorney General John W. McIntosh Assistant Deputy Attorney General Salley W. Elliott
Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Robert M. Ariail,  of Greenville, for Respondent.
 
 
 

PER CURIAM:  Brian William Scott appeals the circuit courts denial of his motion for a new trial, arguing the State violated his due process rights by failing to comply with Rule 5, SCRCrimP and the mandates of Brady v. Maryland, 373 U.S. 83 (1963).  We affirm.
FACTS
In February 1997, a jury found Brian William Scott guilty of murder and sentenced him to life imprisonment.  At his trial, the State relied heavily on the testimony of James Johnson and Tyrone Adams, both present at the alleged murder of Tyrone Longino.
According to James Johnsons trial testimony, he met Scott while working at a local restaurant a couple of weeks prior to the incident in question.  Johnson testified he left work around 10:30 p.m. on the night of February 14, 1992.  While walking to a friends house, Johnson ran into Scott, Adams, Longino, and another co-worker.  He was introduced to Adams and Longino for the first time.  The group then went to an apartment shared by Scott and Longino and proceeded to consume alcohol and smoke marijuana.  At some point, Johnsons other co-worker left.  The remaining four then spent some time driving around in Longinos car and making phone calls in an attempt to purchase drugs.
Following several failed attempts to secure a drug purchase, the group pulled into a gas station.  Adams exited the vehicle and walked to a nearby phone to page a potential seller.  Johnson testified that an argument then ensued between Scott and Longino over the roommates apparent lack of enthusiasm for the drug purchase.  According to Johnson, Scott became increasingly aggravated at Longino and eventually began strangling him with an unknown object from his position in the seat directly behind Longino.  Once Longino was rendered unconscious, Scott ordered Adams and Johnson to help him move the victim into the front passenger seat.  He instructed Adams to drive as Johnson and he returned to the back seat.  Johnson testified that shortly thereafter, Scott suddenly pulled out a large kitchen knife and reaching around from the back seat, he stabbed Longino in the chest.
According to Johnson, Scott then directed Adams to drive to a nearby park where Scott and Adams placed Longinos body in a dumpster.  Afterwards, Scott returned to his apartment.  Adams and Johnson drove Longinos car to Adams apartment and smoked crack until Johnson reported to work the following morning.
On February 15, Greenville police received a call reporting a parked car at a local apartment complex that appeared to have a bloodstained interior.  Officers located the vehicle and checked the suspected drivers apartment.  In the apartment, officers found Adams, who claimed he borrowed the car from Longino and explained the blood stains were a result of an unfortunate nosebleed.  Adams admitted to partially cleaning out the car and revealed the location of his bloodstained clothing.  He was arrested for an outstanding warrant, and the car was impounded.  Police verified that the car belonged to Longino.
The police then attempted to locate Longino at his apartment to confirm Adams nosebleed claim.  At Longinos apartment, officers encountered Scott for the first time.  Scott had a large knife stuck in the back of his belt, which was taken by the police.  He claimed he had not seen Longino in days, but he acted nervous around the investigating officers.  After Scott refused to consent to a search of his apartment, the officers returned the knife and left the residence.
At approximately 11:30 p.m. that night, the Greenville City Police received a call from county authorities reporting that a body was found in a dumpster at a local park.  The body was identified as Longino.  Injuries to the body confirmed he was strangled and stabbed once in the chest.
Officers then interrogated Adams a second time regarding the events of February 14.  At this point, Adams submitted a written statement claiming Scott strangled and stabbed Longino, and the group then helped him hide the body in the park dumpster.  Pursuant to Adams revised statement, an arrest warrant was issued for Scott.  Through an anonymous tip, Scott was located hiding under a bed at his girlfriends apartment, the large knife still in his possession.  After his arrest, Scott refused to answer questions concerning the death of his roommate.  On February 18, Johnson turned himself in to police after seeing a story about the murder on the local news.  Johnson then submitted a written statement consistent with Adams recollection of Longinos death.  
Scott, Adams, and Johnson were indicted for Longinos murder.  In 1992, the charges against Scott were dismissed, presumably due to an issue concerning the location of witnesses.  In 1996, however, Scott was re-indicted for murder and tried before a jury.  Scotts trial took place prior to any prosecution of Adams or Johnson regarding Longinos death.
As previously stated, the State relied heavily on Johnsons and Adams testimony concerning the events in question.  Adams trial testimony regarding Longinos murder was consistent with that of Johnson, reviewed above.  Particularly germane to this appeal, Adams testified he returned to the car from the gas station pay phone to find Scott strangling Longino with what appeared to be a piece of rope.  Adams also testified he witnessed Scott stab Longino from the rear seat.  The jury found Scott guilty of murder and, the judge sentenced him to life imprisonment.  Adams eventually pled guilty to obstruction of justice and received a seven year sentence with credit for time served.
In 2000, Scott retained counsel and initiated a post conviction relief action (PCR).  Scotts PCR counsel filed a Freedom of Information Act request with the 13th Circuit Solicitors Office seeking all information in any way related to the death of Longino.  After an extended, often heated, exchange of phone calls and letters with the solicitors office, the requested documents were eventually turned over to Scotts counsel.
Included in these documents was a certified written statement signed by Adams entitled Notice of Intended Plea and dated May 20, 1994.  In this document, Adams avers the following:

3. Defendant [Adams] was, consistent with prior statement(s), talking on the telephone in the area of the crime having no knowledge of the act until he entered the vehicle in which he was a passenger, finding the body of the victim.
4. Relative to the actual perpetrator of the crime, Defendant could only speculate as to whom the actual perpetrator was as he (Defendant) did not witness the act.
. . . .
6. Defendant freely admits that he drove the car belonging to the victim, that he was merely present during the commission of the crime, with that presence being out of sight of the crime and without the knowledge of the act being in progress.

The signed verification/certification of service block to this document reads I have placed the original and one copy of this document in the U.S. Mail at the Lee Correctional Institution at Bishopville, SC, addressed to the; CLERK OF COURT, GREENVILLE COUNTY COURT HOUSE, GREENVILLE, SC:  OFFICE OF THE SOLICITOR, GREENVILLE COUNTY, GREENVILLE, SC. (emphasis in original)
This document was not provided to Scott pursuant to his Rule 5, SCRCrimP and Brady motions prior to his murder trial.  According to Scotts former PCR counsel, the document was present in the Greenville County Clerk of Courts Office in Adams file numbered 98-GS-23-2330, which is the enumeration for Adams obstruction of justice case.  Although the document also relates to Adams murder charge and is numbered accordingly (92-GS-23-7889), Scotts former PCR counsel stated in writing that the document was not present in Adams murder charge case file when she searched it in January 2000.
Scott filed a Rule 29(b), SCRCrimP, motion for a new trial in the circuit court, arguing that the States withholding of this document violated his due process rights by failing to comply with Rule 5, and the mandates of Brady v. Maryland, 373 U.S. 83 (1963).  The circuit court denied the motion, concluding the document, filed with the clerk of court, was a matter of public record.  Thus, it was available to a diligent defendant and not within the scope of a Brady motion.  The circuit court also denied the motion because the document complained of was merely cumulative and impeaching.  Further, the trial court found the document was not the nature of evidence which would result in a different outcome in a new trial.  
DISCUSSION
Scott argues the circuit court erred in denying his Rule 29(b) motion for a new trial because the States failure to provide Adams sworn statement to the defense violated his due process rights by failing to comply with Rule 5, and the mandates of Brady v. Maryland, 373 U.S. 83 (1963).[1]  We disagree.
To prevail on a Rule 29(b) motion for a new trial based upon after discovered evidence, Scott must show the after discovered evidence: (1) is such that would probably change the result if a new trial were granted; (2) has been discovered since the trial; (3) could not in the exercise of due diligence have been discovered prior to the trial; (4) is material; and (5) is not merely cumulative or impeaching.  State v. Spann, 334 S.C. 618, 513 S.E.2d 98 (1999).
Further, Rule 5 provides in pertinent part that upon request of the defendant, the prosecution shall permit the defendant to inspect and copy documents, which are material to the preparation of his defense or are intended for use by the prosecution as evidence in chief at the trial.  Rule 5(C), SCRCrimP.
Finally, it is a violation of a defendants due process rights for the prosecution to withhold evidence favorable to the defendant where the evidence is material either to guilt or to punishment.  Brady, 373 U.S. at 87.  This rule applies to impeachment evidence as well as exculpatory evidence.  U.S. v. Bagley, 473 U.S. 667 (1985).  A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.  Id. at 674-75.  In addition, this Court recognizes there is no general public records exception to the Brady rule requiring the production of favorable evidence.  Chavis v. State of North Carolina, 637 F.2d 213 (4th Cir. 1980); Anderson v. State, 709 F.2d 887 (4th Cir. 1983).  
The common theme in Rule 29(b), Rule 5, Brady, and its progeny is that relief will be granted only if the information withheld is material.  The United States Supreme Court delineated the standard for determining materiality in United States v. Agurs, 427 U.S. 97, 112-13 (1976):

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.  Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt.  It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trail.  On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

In the case at bar, the State relied on trial testimony of Adams as well as Johnson.  Arguably, Johnsons testimony is the stronger of the two, considering that Johnson was in the car seated next to Scott during both the strangling and the stabbing.  Adams trial testimony confirmed he was outside the car when he saw Scott strangle Longino and inside the car when Longino was stabbed.  In addition, police recovered Adams blood-soaked clothes, suggesting he was in close proximity to Longino when he was stabbed.  Police also recovered a long knife from Scotts person.  That knife was consistent with Johnsons eyewitness testimony and with the wound on Longinos chest.
The document Scott complains the prosecution withheld does little to refute the trial testimony.  In the document, Adams claims he did not see the crime, but he did help drive the car and move the body.  In the document, Adams does not differentiate between the strangling and the stabbing.  While the document may diminish Adams credibility, it does not offer exculpatory evidence which would create a reasonable doubt as to Scotts guilt.  As such, if the defense was in possession of the document at trial, its only purpose would be to impeach Adams trial testimony.  Even if the jury would have given less credit to Adams testimony, the record taken as a whole still supports a guilty verdict.
CONCLUSION
The trial court denied Scotts motion for a new trial based on after-discovered evidence, in part, because the document is merely cumulative and impeaching.  The trial court also found the document was not the nature of evidence which would result in a different outcome in a new trial.  The document Scott complains of was not material either to his guilt or punishment.  As such, the omission of this document did not impede Scotts due process rights, nor did it deprive him of a fair trial.
Accordingly, the trial courts decision is 
AFFIRMED. 
KITTREDGE, SHORT, and WILLIAMS, JJ., concur.

[1] Scott also argues that these documents prove Adams was offered leniency in exchange for his testimony in Scotts trial, an assertion which further belies Adams trial testimony.  The document goes on to state there have been no promises, threats, coercion, and/or any other forms of duress from any law enforcement official representing Greenville County nor the State of South Carolina.